**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| ANTHONY MELIKHOV, an individual; MELMAR HOLDINGS, LLC, an Illinois limited liability company; and U4G GROUP, LLC, an Illinois limited liability company | ) ) ) ) ) | |
|  | ) | 16 C 9332 |
| Plaintiffs, | ) | |
| v. | ) ) | Judge Virginia M. Kendall |
| LADISLAV DRAB, an individual; CE GROUP, a foreign entity; ČESKÁ ENERGIE, A.S., a foreign entity; and ČESKÁ PLYNÁRENSKÁ A.S., a foreign entity | ) ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Anthony Melikhov, Melmar Holdings, LLC, and U4G Group LLC's sued Ladislav Drab and three corporate entities under his control after Drab and the corporate defendants failed to: (1) repay a $5 million business loan; and (2) contribute $30 million in capital to U4G Group as promised. Defendants have moved to compel mediation and, if necessary, arbitration of Plaintiffs' claims relating to the failed contribution to U4G Group (Counts II–IV) and to dismiss Plaintiffs' fraud (Counts III, VI, VII, XVI), unjust enrichment (Count V), and accounting claims (Counts VI, XII, XV), along with three claims predicated on violations of the Investment Advisor Act (Counts XIII–XVI).[1] Additionally, in their Reply, Plaintiffs seek leave to amend the Second Amended Complaint ("SAC") to add securities laws

---

[1] Plaintiffs' Second Amended Complaint contains sixteen claims for relief, including claims for: breach of contract (Counts I, II, VIII, IX, X, XI), fraud (Counts III, XVI), promissory estoppel (Count IV), unjust enrichment (Count V), accounting (Counts VI, XII, XV), fraudulent inducement (Count VII), violating the Investment Advisors Act (Count XIII), and breach of fiduciary duty (Count XIV).

claims. For the reasons stated below, Defendants' Motion to Dismiss is granted in part and denied in part and Plaintiffs' motion for leave to amend is granted.

### STATEMENT OF FACTS

This Court takes the following well-pleaded allegations from the SAC and treats them as true for purposes of this motion. *See Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015). Melikhov is an entrepreneur and philanthropist involved in founding and supporting non-profit organizations. (SAC ¶ 21.) Melikhov founded Bright Future International ("BFI"), a charitable organization that helps underprivileged children by funding arts and educational enrichment programs through partnerships with local and international organizations. (*Id.*) Melikhov also founded DoMore4:Good, a charitable organization designed to bring students together with local nonprofits and leaders to inspire them to perform acts of kindness and service. (*Id.* ¶ 22.) Melikhov established U4G Group, a for-profit entity, to combine technology and social enterprise to generate profits to fund Melikhov's charitable organizations and eliminate their reliance on grants to operate. (*Id.* ¶ 23.) Melikhov, either directly or through his affiliated entities, donates money to other charitable organizations. (*Id.* ¶ 24.)

During the summer of 2013, Melikhov spent approximately one week visiting Clinton Foundation projects in Africa. (*Id.* ¶ 24.) During this trip, Melikhov met Drab who introduced himself as an energy trader who owned several successful energy companies. (*Id.* ¶ 25.) Drab is the founder, owner, principal, officer, director, and board member of Defendants CE Group, Ćeská Energie, and Česká Plynárenská. (*Id.* ¶ 4.) Drab claimed to be a philanthropist interested in supporting charitable organizations and informed Melikhov that he and his companies were worth millions of dollars. (*Id.* ¶ 25.) Drab also said he was good friends with President Clinton and that the two regularly played golf. (*Id.*) Throughout the course of the trip, Melikhov and

Drab discussed Melikhov's charitable endeavors and his plan for U4G Group and expressed enthusiasm about becoming involved in Melikhov's charitable and business endeavors. (*Id.* ¶ 26.)

Drab and Melikhov stayed in contact following the Africa trip. (*Id.* ¶ 27.) Drab called Melikhov to discuss how he could attract sponsors to contribute to Melikhov's charities and how Drab personally would contribute millions of dollars to help build U4G Group. (*Id.*) In late 2013, based on Drab's expressed desire to partner with Melikhov in his philanthropic endeavors, Melikhov invited Drab to a charity event, which Drab attended. (*Id.* ¶ 28.) The two continued talking over the next few months about how Drab could help Melikhov and his charities. (*Id.* ¶ 29.) Drab also inquired about attending Melikhov's inaugural Unite4: Humanity Event in February 2014, and Melikhov invited Drab and his wife to the event. (*Id.* ¶ 29.) Leading up to the event, Drab promised Melikhov that he would contribute upwards of $30 million to U4G Group in exchange for becoming a 50% owner of U4G Group, in addition to a Manager and Founding Member of U4G Group and U4G Planet, LLC ("U4G Planet"), its parent company. (*Id.* ¶ 30.) Drab also represented that someone was going to pay him millions of dollars for half of his interest in an energy facility, and that those funds would be used to purchase Drab's interest in U4G Group. (*Id.*) Drab also claimed he was talking to a European lottery agency looking to open lottery franchises and that U4G Group could benefit from profits in the lottery. (*Id.*)

In addition to their interactions regarding U4G Group, Drab approached Melikhov for a business loan for his companies. (*Id.* ¶¶ 31, 33.) Melikhov agreed to negotiate a business loan "[s]ince Drab was promising to contribute over $30 million to U4G Group, had represented himself to be a wealthy multi-millionaire who owned multiple companies, and had promised to

find other sponsors to donate to Melikhov's charitable organizations." (*Id.* ¶ 31.) Throughout the next several months, Melikhov and Drab negotiated the terms of the business loan and discussed Drab joining U4G Group as a partner. (*Id.* ¶ 32.) Drab and Melikhov entered into an oral agreement in February 2014 where "Melikhov agreed to loan Drab $5 million and Drab agreed to repay Melikhov both principal and interest at the rate of 10% per year within twelve months." (*Id.* ¶ 33.) The two agreed the loan would be disbursed in installments since Melikhov needed to liquidate certain assets to fund the loan. (*Id.*) Drab orally agreed to repay principal and interest within twelve months from Drab's receipt of each disbursement of the loan (the "Business Loan Agreement"). (*Id.*)

Despite the oral agreement to repay the loans within twelve months of each disbursement, Drab provided Melikhov with four Memoranda of Understanding ("MOU"), the first in February 2014 (the "February 2014 MOU") in regards to a $2 million disbursement, a second in June 2014 (the "June 2014 MOU"), a third in July 2014 (the "July 2014 MOU"), and a fourth in September 2014 (the "September 2014 MOU"). Each MOU set forth terms where Drab would repay Melikhov over a three-year period at a rate of 10% per year and provided that the parties would sign Investment Cooperation Agreements, which would embody the terms of the MOUs. (*Id.* ¶¶ 34, 35, 41, 44, 46.) The parties never entered into any Investment Cooperation Agreements. (*Id.* ¶ 35.) Melikhov asserts that the various MOUs were not reflective of the terms that the parties orally agreed to in the Business Loan Agreement, and he only understood them to reflect Drab's acknowledgement that he had borrowed money from Melikhov. (*Id.*) Of the four MOUs drafted by Drab, Melikhov only executed the February 2014 MOU. (*Id.*) The MOUs also included Drab's promise to pledge shares of his company, Česká Plynárenská, as security for the debt. (*Id.* ¶¶ 35, 41, 44, 46.)

On March 6, 2014, after he executed the February 2014 MOU, Melikhov caused Melmar Holdings, LLC (a company that Melikhov founded and of which he is a member) to wire $2 million to Česká Energie, one of Drab's companies. (*Id.* ¶ 36.) On March 18, 2014, Drab met with Melikhov to discuss his roles with Melikhov's companies and the additional disbursements due under the Business Loan Agreement. (*Id.* ¶ 37.) Drab sent an email to Melikhov on May 21, 2014, proposing to invest $3 million in U4G Group by the end of March 2015 and $30 million by the end of July 2015. (*Id.* ¶ 38.) Throughout early 2014, Drab also represented to Melikhov that he would talk to his connections at Deutsche Bank and EON to persuade them to sponsor the 2015 Unite4:Humanity Event ("Event"), a charitable event organized by Melikhov. (*Id.* ¶ 39.) When Melikhov asked Drab about the status of the investments and explained that he hoped Drab would present sponsors at the Event, Drab said that he had spoken to prospective sponsors. (*Id.*) Based on all of the promises made by Drab, on June 13, 2014, U4G Group had Drab complete and sign a bank form granting Drab permission to transact for U4G Group through its bank account. (*Id.* ¶ 40.)

On June 23, 2014, approximately one week after Drab sent Melikhov the June 2014 MOU, Drab and Melikhov met to discuss Drab's roles with Melikhov's companies and the further disbursements under the Business Loan Agreement. (*Id.* ¶ 42.) As a result of this meeting, Melikhov wired $1 million from Melmar to CE Group. (*Id.*)

On July 9, 2014, Drab signed an Operating Agreement of U4G Group (the "U4G Operating Agreement") in which he agreed to contribute $30 million to U4G Group within one year and was added as a Founding Member and Manager. (*Id.* ¶ 43.) Melikhov consulted with Drab about strategies for U4G Group based upon his understanding that Drab was committed to being involved with U4G Group. (*Id.*)

On August 25, 2014, Melikhov caused Melmar to wire $1 million to Drab, even though the July 2014 MOU described a $2 million disbursement. (*Id.* ¶ 45.) Melikhov also wired $1 million from Melmar to the CE Group on September 15, 2014, a disbursement which was outlined in the September 2014 MOU. (*Id.* ¶ 47.)

On November 21, 2014, Drab signed the Limited Liability Company Operating Agreement of U4G Planet, the holding company for U4G Group, becoming a Founder Member and a manager. (*Id.* ¶ 50.) Drab's status at U4G Planet was also based on his agreement to contribute $30 million to U4G Group by July 2015. (*Id.*)

Melikhov contacted Drab on January 26, 2015, regarding Deutsche Bank's potential sponsorship of the Event. (*Id.* ¶ 52.) On February 3, 2015, Drab said he had a final meeting with Deutsche Bank but no sponsorship of the Event was ever received because of Drab's efforts, even though Drab informed Melikhov that Deutsche Bank and EON pledged money. (*Id.* ¶¶ 52, 56.)

On March 6, 2015, pursuant to the terms of the oral Business Loan Agreement, Drab was obligated to pay Melikhov and Melmar $2 million in principal plus $200,000 in interest but Drab failed to make any payment. (*Id.* ¶ 55.) Drab also failed to wire funds on April 6, 2015, after Melikhov forwarded Drab the banking wire information. (*Id.* ¶ 57.)

On April 9, 2015, Melikhov asked to speak with Drab regarding his failure to pay any of the $30 million he agreed to contribute to U4G Group. (*Id.* ¶ 58.) Between July and September 2015, Melikhov also made several unsuccessful requests for Drab's repayment of the $5 million loan that he owed Melikhov and Melmar and the $30 million he agreed to contribute to U4G Group and U4G Planet. (*Id.* ¶ 61.) Drab was withdrawn as a Member and Manager from U4G Group and U4G Planet on September 10, 2015, due to his failure to comply with his

responsibilities under the Operating Agreements, which required that he contribute capital. (*Id.* ¶ 62.)

Following the filing of the initial complaint in this matter on September 26, 2016, Drab interacted with Melikhov via text message, telephone, and an in-person meeting to confirm that he owed Melikhov $5 million plus interest. (*Id.* ¶ 66.) On October 18, 2016, Drab prepared a notarized document in Czech reaffirming that he owed $6 million to Melikhov and Melmar. (*Id.* ¶ 66.) Drab promised to repay Melikhov the money within a day or two, but never did. (*Id.* ¶ 67.) At one point, Drab claimed he already wired the payment to Melmar, but the wire was never received. (*Id.*)

Plaintiffs allege the funds and assets of Drab and his companies have been extensively comingled as reflected by disbursements from Plaintiffs to both Česká Energie and CE Group. (*Id.* ¶¶ 70–71.) Neither Drab nor his companies provided consultation, disclosures, information, or any documentation to Melikhov or Melmar regarding how the $5 million was spent. (*Id.* ¶ 71.)

## STANDARD OF REVIEW

When evaluating a motion to dismiss under Rule 12(b)(6), the Court accepts all facts alleged in the complaint as true and construes all reasonable inferences in the plaintiff's favor. *Firestone Fin. Corp.*, 796 F.3d at 826. Under Rule 8(a)(2), the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The facts alleged in the complaint must give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)).

**DISCUSSION**

Defendants seek an order compelling mediation and, if unsuccessful, arbitration of Plaintiffs' claims involving the U4G Group Operating Agreement based on the Agreement's dispute resolution provisions (Counts II–IV). (Dkt. 61 at 4–6.) Defendants also seek dismissal of Plaintiffs': 1) accounting claims (Counts VI, XII, and XV), since Plaintiffs have an adequate remedy at law; 2) fraud claims (Counts III, VI, VII, XVI), arguing that these claims do not meet the heightened pleading standard for alleging fraud and fail to allege how Plaintiffs were damaged; 3) unjust enrichment claim (Count V), because it is duplicative of the breach of contract claims; and 4) investment adviser claims (Counts XIII–XVI), since Drab is not an investment adviser. (*Id.* at 6–14.) Additionally, Plaintiffs seek to amend the complaint to add securities law claims. (Dkt. 65 at 19–20.)

**I.    Mediation and/or Arbitration of disputes involving the U4G Group Operating Agreement**

Pursuant to the U4G Operating Agreement, Defendants seek to compel mediation and/or arbitration of Plaintiffs' claims for breaching the U4G Operating Agreement (Count II), fraud (Count III), and promissory estoppel (Count IV). (Dkt. 61 at 4–5.) Plaintiffs argue that the Operating Agreement's arbitration provisions are unenforceable by Defendants because they can only be invoked by current U4G Group "Members" to mediate and/or arbitrate and Drab was not a Member of U4G Group at the time the lawsuit was filed. (Dkt. 65 at 13–14.)

Melikhov and Drab signed the U4G Operating Agreement on July 9, 2014, as Managers and Founder Members and Drab was withdrawn as a Member on September 10, 2015, due to his noncompliance with the Operating Agreement, including his failure to contribute $30 million to U4G Group. (SAC ¶ 62.)

8

The U4G Operating Agreement contains two provisions that mention arbitration. (SAC, Ex. C ¶¶ 20, 26.) Paragraph 20 of the U4G Operating Agreement, titled "Buy Out in the Event of Dispute," provides that:

> Other than as set forth in Section 19, in the event of a dispute between any of the Members that cannot be resolved by such Members ("Disputing Members"), notice of the dispute shall promptly be given to the Company and the dispute shall be subject to the mediation procedures set forth in Section 26. If such mediation is not successful, then the following procedures shall be implemented . . . If the dispute is between Founder Members, then such dispute shall be mediated and subsequently arbitrated, if needed, subject to Section 26 of this Agreement.

*Id.* ¶ 20. Paragraph 26 of the U4G Operating Agreement, provides that:

> In any dispute over the provisions of this Agreement and in other disputes among the Members and/or Managers, if the Members and/or Managers cannot resolve the dispute to their mutual satisfaction, the matter may be submitted to mediation. If good-faith mediation of a dispute proves impossible or if an agreed-upon mediation outcome cannot be obtained by the Members and/or Manager who are parties to the dispute, the dispute shall be submitted to arbitration in accordance with the rules of JAMS.

*Id.* ¶ 26. The Federal Arbitration Act ("FAA") provides that arbitration clauses "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects a "liberal federal policy favoring arbitration[,]" and indicates that arbitration is a matter of contract. *Gore v. Alltel Communications, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 643, 339 (2011)). However, "[w]hether or not [a] company [is] bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court on the basis of the contract entered into by the parties." *Lumbermens Mut. Cas. Co. v. Broadspire Mgmt. Servs., Inc.*, 623 F.3d 476, 480 (7th Cir. 2010) (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547 (1964)). As a result, "[a] court may invalidate an arbitration agreement based

on 'generally applicable contract defenses' like fraud or unconscionability, but not on legal rules that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" *Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017) (quoting *AT&T Mobility LLC*, 563 U.S. at 339 (2011)). A "party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." *United Steelworkers of Am. v. Warrior Gulf and Navigation Co.*, 363 U.S. 574, 582 (1960).

An arbitration clause gives rise to a presumption of arbitrability "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 582–83. Ambiguities concerning the scope of the arbitration clause are resolved in favor of arbitration. *See Volt Info. Scis., Inc. v. Bd. of Tr. of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989). A court may order arbitration, however, only if the court "is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010). "In determining whether a valid arbitration agreement arose between the parties, a federal court should look to the state law that ordinarily governs the formation of contracts." *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997).

The U4G Operating Agreement provides that it is governed by Illinois law, and the parties do not argue otherwise. (Dkt. 1-3 ¶ 32); *see Cincinnati Ins. Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771, 773 (7th Cir. 2016). According to the Illinois "four corners" rule of contract interpretation, the threshold question is whether the contract is ambiguous. *Ford v. Dovenmuehle Mortg., Inc.*, 651 N.E.2d 751, 755 (Ill. App. Ct. 1995). Under Illinois law, a contract is ambiguous only if it is "reasonably and fairly susceptible to more than one construction." *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.*, 628 N.E.2d 1165, 1168 (Ill. App. Ct. 1993)

10

(internal quotation marks and citation omitted). Both parties present different interpretations of the term "Member" in the Operating Agreement: Plaintiffs argue that "Member" in the Operating Agreement only applies to current members, while Defendants allege that "Member" applies to Drab and Melikhov, the individuals who signed the U4G Operating Agreement as Founder Members. (Dkt. 65 at 18–19; Dkt. 66 at 4.) However, just because the parties disagree on the definition of a term does not mean the contract is ambiguous. *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 621 (7th Cir. 1989); *see also Flora Bank & Trust v. Czyzewski*, 583 N.E.2d 720, 725 (Ill. App. Ct. 1991) ("A contract is not rendered ambiguous simply because the parties do not agree on the meaning of its terms.") A contract is not ambiguous if the court can discern its meaning through "knowledge of those facts which give it meaning as gleaned from the general language of the contract." *Gardner v. Padro*, 517 N.E.2d 1131, 1133 (Ill. App. Ct. 1987). In evaluating whether ambiguity exists, the contract must be construed as a whole. *L.K. Comstock & Co. v. Morse/UBM Joint Venture*, 505 N.E.2d 1253, 1257 (Ill. App. Ct. 1987).

In considering the U4G Operating Agreement in its entirety, the use of the term "Member" throughout the agreement indicates that "Member" means a current member of U4G Group. *Id.*; *Gardner*, 517 N.E.2d at 1133. The U4G Operating Agreement contemplates that "profits and losses shall be allocated among the Members according to their respective Units[,]" "Members may be paid . . . for any services rendered in any other capacity for the Company[,]" and "Meetings of the Members shall be held[.]]" (Dkt. 55-3 at 5, 7.) A former member would not be allocated profits, paid for services rendered, or participate in meetings with members as this would frustrate the purpose of membership in U4G Group. Furthermore, the Operating Agreement's provision addressing "Membership" makes clear that owning "membership interests" in the company is what sets members apart from others. That is, the defining feature

of being a member is owning equity in the company, something that former members, by definition, do not have.

Paragraph 20 of the U4G Operating Agreement, which governs buy outs in the event of a dispute between Founder Members, provides that such disputes "shall be mediated and subsequently arbitrated[.]" (SAC, Ex. C ¶ 20.) The term "Member" in this context also supports the conclusion that the term Member references current members as former members have no stake in the company to buy out. (SAC, Ex. C ¶¶ 3, 20.)

This interpretation is supported by *Valinote v. Ballis*, where the Seventh Circuit concluded that the most natural reading of the term "Member" within a similarly-structured operating agreement meant current, not former members. 295 F.3d 666, 670 (7th Cir. 2002). The court in *Valinote* evaluated the operating agreement's buyout provision, explaining the buying member must "[a]ssume and become liable for all obligations of the selling Member to the Company[,]" along with a provision that stated that if a member who guaranteed repayment of a loan on behalf of the company incurred any costs, the costs could be shared across members. *Id.* at 667, 669. The court explained that reading these provisions together as applying to former members meant former members "could not be 'members' for purposes of collection while escaping that status for purposes of liability." *Id.* at 670. The court explained that "Member" should be read as current member and excluding former members as "[t]his is the most natural reading" and "avoids questions about what each person's responsibility is." *Id.* The present case parallels the conclusion made by the court in *Valinote* as, when read in context of the entire agreement, it would be internally inconsistent to read the terms "member" in Paragraphs 20 and 26 as applying to former members, when other references to members in the agreement make

clear as applying to current members. As in *Valinote*, the most natural reading of the arbitration provisions is reading "Member" as "current member."

Paragraph 18 of the Operating Agreement, which pertains to departing members, supports this interpretation. Paragraph 18 provides, in relevant part, in circumstances where a Member has withdrawn and the Company does not purchase the departing Member's units, the "withdrawn Member shall have no other rights granted to Members under this Agreement." (SAC, Ex. C ¶ 18.) The parties agree that Drab was withdrawn as a Member and Manager by agreement with Melikhov on September 10, 2015, a year before the instant suit was filed. (Dkt. 65 at 19–20; Dkt. 56 ¶ 62.) Therefore, under Paragraph 18, Drab, as a withdrawn Member, has no current "rights" granted to Members under the agreement, including the right to compel another member to arbitrate a dispute. (SAC, Ex. C ¶ 18)

Defendants contend interpreting the term "Member" to apply only to current members requires the Court to add language to the Agreement and that in Paragraph 27, a reference to "current Member" indicates that all other references to member in the Operating Agreement encompasses former members. (Dkt. 66 at 2–5.) Paragraph 27, however, is distinguishable from Paragraphs 20 and 26, and other references to "Member" as it relates to modifying the Agreement. (SAC, Ex. C ¶ 27.) The language in Paragraph 27 allows "current Members of this Company as well as any and all additional parties who became Members of this Company after the adoption of this Agreement" to modify the Operating Agreement. (*Id.*) Drab and Melikhov were the only Members of the Company at the time the original Operating Agreement was written and Paragraph 27 allows future members of the company to modify the Operating Agreement even though they were not the initial Founder Members. (*Id.*) For these reasons, the Court concludes that the parties did not agree to arbitrate *this dispute*. *Granite Rock Co.*, 561

U.S. at 297. Defendants' Motion to Compel Mediation/Arbitration of Counts II, III, and IV is denied.

## II.      Accounting Claims

Defendants argue that Plaintiffs' claims requesting an accounting should be dismissed since Plaintiffs do not allege the absence of an adequate remedy at law, a requirement to seek an accounting. (Dkt. 61 at 6.) Plaintiffs tacitly concede that they have an adequate remedy at law but respond that this Court still has the equitable jurisdiction to compel an accounting when a fiduciary relationship exists, fraud is alleged, or discovery is sought. (Dkt. 65 at 2.)

An equitable accounting is "an adjustment of the accounts of the parties and a rendering of the balance ascertained to be due." *Drake Enters. v. Colloid Envtl. Techs. Co.*, No. 08-6753, 2009 WL 1789355, at *3 (N.D. Ill. June 24, 2009) (quotation omitted).  To state a claim for an accounting, a plaintiff must allege the "absence of an adequate remedy at law." *Kempner Mobile Elecs., Inc. v. Southwestern Bell Mobile Sys.*, 428 F.3d 706, 715 (7th Cir. 2005) (citing *Mann v. Kemper Fin. Cos., Inc.*, 618 N.E.2d 317, 327 (Ill. App. Ct. 1992)).  To succeed, Plaintiffs must also allege at least one of the following: "(1) a breach of a fiduciary relationship, (2) a need for discovery, (3) fraud, or (4) the existence of mutual accounts which are of a complex nature." *Kempner*, 428 F.3d at 715.

Even when these prerequisites have been satisfied, a "district court has broad discretion in deciding whether an accounting is appropriate." *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 545 (7th Cir. 2003) (internal quotation marks omitted). *See also First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985) ("Because an accounting is an equitable remedy, a court has broad discretion to determine whether it is appropriate to order an accounting.").  Although a plaintiff's request for an accounting is based

on an inadequate remedy at law, the Court evaluates the circumstances of the case and the relief sought to determine whether it will take jurisdiction. *Dailey v. Sunset Hills Tr. Estate*, 332 N.E.2d 158, 162 (Ill. App. Ct. 1975).

To the extent the MOUs are found to be legally enforceable, in Count XII, Plaintiffs seek an accounting of all transactions and all accounts of Defendant Česká Plynárenská since the MOUs pledged shares in that company as collateral for the $5 million loan. (SAC ¶ 29.) Because breach of contract remedies typically obviate the need for an accounting, when plaintiffs seek an accounting in relation to such claims, they must show that there are mutual accounts between the parties or another complexity in calculating damages that would justify an accounting. Plaintiffs have not alleged that there are any mutual accounts here nor have they alleged the complexity necessary to order an accounting. Only one case that Plaintiffs cite to support their claim for an accounting based on breach of contract demonstrates the type of complexity necessary to render an accounting appropriate. In *Billboard Publishing Company v. McCarahan*, the court found an accounting was necessary when there were nearly 200 separate contracts at issue, both oral and written, with varying terms of commission and discounts. 151 Ill. App. 227, 229 (Ill. App. Ct. 1909). Here, there are only four contracts at issue, each has almost identical substantive terms, and each MOU indicates the amount of money owed. On these facts, Plaintiffs' for an accounting based on the MOU claim is devoid of facts indicating why Česká Plynárenská or CE Energie's accounts rise to the level of complexity entitling Plaintiffs to an accounting. Claims VIII through XI already raise a breach of contract claim for the MOUs. (SAC at 25–29.) Additionally, the information requested should be revealed through discovery. *Kempner*, 428 F.3d at 715 (upholding the district court's denial of an accounting, explaining the case was no more than a garden-variety contract dispute and damages were not

difficult to measure).  Since Plaintiffs have an adequate legal remedy through their breach of contract claims, and Plaintiffs have not demonstrated other grounds entitling them to an accounting, Count XII is dismissed.

Plaintiffs also seek a detailed and itemized accounting of Defendants' use of the $5 million loan in relation to their fraud[2] (Count VI) allegation in order to calculate the amount of money owed by Drab and his companies. (SAC ¶¶ 97–100.)  To support this claim, Plaintiffs rely on a century-old Illinois Appellate Court opinion, which noted that courts of equity have jurisdiction to compel an accounting, despite an adequate remedy at law, where a fiduciary relationship exists or fraud is charged. *See Mayr v. Nelson Chesman & Co.*, 195 Ill. App. 587, 602 (Ill. App. Ct. 1915).  Upon review of recent case law, however, a number of courts, including the Illinois Appellate Court, have since reiterated the longstanding principle that a showing of an inadequate remedy at law is necessary, even with allegations of fraud. *See Oil Express Nat'l, Inc. v. Latos*, 966 F. Supp. 650, 652 (N.D. Ill. 1997) (dismissing claim requesting an equitable accounting, despite a breach of fiduciary duty allegation, since there was an adequate remedy through a breach of contract claim and the parties' transactions were not complicated); *Greene v. Mizuho Bank, Ltd.*, 206 F. Supp. 3d 1362, 1378–79 (N.D. Ill. 2016); *see also Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962) ("The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is . . . the absence of an adequate remedy at law."); *First Commodity Traders,* 766 F.2d at 1011 ("A court may refuse to reward an equitable accounting to a party who has an adequate remedy at law."); *Zell v. Jacoby-Bender, Inc.*, 542 F.2d 34, 36 (7th Cir. 1976) (explaining the absence of an adequate remedy at law is the necessary prerequisite to a suit for an equitable accounting); *Devyn*

---

[2] Plaintiffs also seek an accounting on the basis of their claims for breach of fiduciary duty (Count XV). Count XV fails for other reasons analyzed below.

*Corp. v. City of Bloomington*, 38 N.E.3d 1266, 1278–79 (Ill. App. Ct. 2015) (citation omitted) ("To sustain an action for an equitable accounting, the plaintiff must show the absence of an adequate remedy at law. . . . a trial court will not order an equitable accounting where to do so would be unnecessary.").

Furthermore, Plaintiffs' allegations fail to justify the need for an accounting under these circumstances. As discussed above, Plaintiffs have an adequate remedy at law if they are successful in their breach of contract claims and their damages and the accounts at issue are not overly complicated. In a factually similar case, *Greene*, a district court within this district dismissed the plaintiffs' fraud-based accounting claims since the damages were not difficult to measure. 206 F. Supp. 3d at 1378–79. There, in a situation involving two unrecovered deposits, the court found that the plaintiffs made no showing that the accounts between the parties were "of such a complicated nature that only a court of equity can satisfactorily unravel them." *Id.* at 1378–79 (quotation marks omitted). Further, the court emphasized that ongoing discovery would reveal accounting information pertinent to the plaintiffs' claims. *Id.* at 1378. That logic holds here. The damages "are not speculative, and the amount of damages is neither difficult nor impossible to measure," since the damages are simply for the loans and interest. *Greene*, 206 F. Supp. at 1378 (quotation omitted); *see also Burr v. State Bank of St. Charles*, 100 N.E.2d 773, 776 (Ill. App. Ct. 1951) (explaining the accounting claim was properly dismissed as the accounts were not complicated and discovery would reveal information relating to the rents and profits). Since the damages here are straightforward, Plaintiffs have an adequate remedy at law, and discovery should provide sufficient, Count VI is dismissed.

### III.    Plaintiffs' Fraud Claims

Defendants seek dismissal of Plaintiffs' fraud and fraudulent inducement counts[3] (Counts III, VII), arguing that, for various reasons, the allegations are insufficiently pled. (Dkt. 61 at 7.)

Plaintiffs allege that Defendants knowingly misrepresented their financial means to repay the $5 million loan and contribute $30 million to U4G Group, that Drab intended to partner with Melikhov, and that Drab contacted companies to sponsor Unite4:Humanity events (Count III). Count VII alleges fraudulent inducement against Defendants for their representations which were intended to defraud and induce Plaintiffs to enter into the MOUs and loan Defendants $5 million. (*Id.* ¶¶ 101–109.) To support these fraud claims, Plaintiffs allege that the fraudulent scheme began when Melikhov first met Drab in Africa in July 2013 and Drab represented that he owned several successful companies worth millions of dollars and a private jet. (*Id.* ¶ 25.) During this trip, Drab claimed he was good friends with President Clinton and that they regularly played golf. (*Id.*) Drab also said he was a philanthropist interested in supporting charitable organizations. (*Id.*) Plaintiffs allege that they provided the $5 million loan as a direct result of Drab's representations that he had the ability to repay the $5 million loan and would contribute $30 million to U4G Group. Further, Plaintiffs allege that in late 2013 Drab continued to talk to Melikhov about how he could help Melikhov and his charities. (*Id.* ¶ 29.) During this time, Drab continued to promise Melikhov that he would contribute upwards of $30 million to help build the U4G Group platform and in return, Drab would become a 50% owner of U4G Group. (*Id.* ¶ 30.) Drab claimed someone was going to buy fifty percent of Drab's multi-million dollar interest in an energy facility and he would contribute those funds to U4G Group. (*Id.*) Drab also represented he was communicating with a European lottery agency looking to open franchises

---

[3] Defendants also seek to dismiss Plaintiffs' claims for an accounting related to Plaintiffs' alleged fraud (Count VI) and their claim for fraud under the Investment Advisers Act (Count XVI). For the reasons explained elsewhere in this opinion, those claims are dismissed and need not be addressed here.

and that U4G Group could benefit from profits in the lottery. (*Id.*) Plaintiffs allege that on June 12, 2014, Melikhov asked Drab about the status of his conversations with Deutsche Bank and EON as potential sponsors for a charity event, and Drab replied that he had spoken to them. (*Id.* ¶ 39.) Plaintiffs allege that Drab's promises led to U4G Group permitting Drab to transact on U4G Group's behalf. (*Id.* ¶ 40.)

Defendants first argue that the U4G Operating Agreement provides the exclusive remedies for any violations related to Defendants' alleged failure to contribute capital and vitiates Plaintiffs' fraud claims. They also argue that the agreement supersedes any statements to contribute $30 million to U4G Group made by Defendants. (Dkt. 66 at 8.) The Defendants, however, fail to cite any support for their argument, and the Court finds it misguided, as it would excuse the misrepresentations of any party who fraudulently induces another party to enter into a contract. Although contract law provides that "a written declaration informing one party of an important fact dominates a contrary oral declaration[,]" Drab's statements regarding his ability to contribute $30 million U4G Group, however, are consistent with the U4G Operating Agreement and if true, are sufficient to state a claim for fraud. *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322 (7th Cir. 1988). In *Acme*, the court reversed the district court's dismissal of the plaintiff's fraud claim, explaining the written document's repetition of the statements alleged to be false did not correct any oral falsehoods. *Id.* at 1325. The court explained that written words only govern oral promises to reward truthful disclosures, this rule "is not designed to make it easy to perpetrate oral frauds." *Id.* In the present case, Plaintiffs allege that Drab "engaged in a pattern of fraudulent statements" when he signed the U4G Operating Agreement as he continued to misrepresent his ability to contribute $30 million to U4G Group. (SAC ¶ 86.) The Operating Agreement does not contradict any of the statements Drab made and does not supersede his oral

representations—in fact it memorializes Drab's fraudulent statement. As a result, Plaintiffs' reliance on Drab's statements prior to the U4G Operating Agreement is permitted. *See Vigortone Ag Prods., Inc. v. PM Ag Prods., Inc.*, 217 F. Supp. 2d 858, 865 (N.D. Ill. 2001) (rejecting defendant's argument that the plaintiff cannot rely on the oral misrepresentations in its fraud claim by explaining the agreement at issue did not supersede the oral misrepresentations partially because the agreement did not explicitly contradict the alleged oral misrepresentations).

Defendants also argue that Plaintiffs' allegations fail to satisfy Rule 9(b)'s heightened pleading standard. In alleging fraud, Rule 9(b) requires Plaintiffs to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). In alleging fraud under Rule 9(b), a plaintiff must "state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.,* 20 F.3d 771, 777 (7th Cir. 1994) (quotation marks omitted). The purpose of Rule 9(b)'s heightened pleading standard in alleging fraud is "to force the plaintiff to do more than the usual investigation before filing his complaint." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). A claim for fraud must also include the following components: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (quoting *Connick v. Suzuki Motor Co., Ltd.,* 675 N.E.2d 584, 591 (Ill. 1996)). Rule 9(b) requires the plaintiff to give the "first paragraph of any newspaper story: 'the who, what, when, where, and how.'" *Wigod v.*

*Wells Fargo Bank, N.A.,* 673 F.3d 547, 569 (7th Cir. 2012).

Plaintiffs' allegations satisfy Rule 9(b)'s heightened pleading standard. Plaintiffs identify Drab as the individual who made the misrepresentations, where the representations were made, their content, and the means of communication. *Vicom,* 20 F.3d at 777. For example, Plaintiffs plead that Melikhov, while in Illinois, received calls from Drab to discuss how Drab would attract sponsors that would contribute to Melikhov's charities as well as personally contribute millions of dollars to build U4G Group. (SAC ¶ 27.)

Further, the Court rejects Defendants' contention that these events should be considered independently as Plaintiffs adequately outline Defendants' scheme from the beginning to induce the loan and membership in U4G Group. (Dkt. 65 at 12; Dkt. 61 at 7–8.) Plaintiffs explain that during the Africa trip Drab expressed tremendous enthusiasm to Melikhov about becoming involved with Melikhov's charitable endeavors and called Melikhov following the trip to discuss methods of contribution; Drab continued to promise Melikhov that he would put upwards of $30 million to help build the U4G Platform in exchange to become a Manager and Founding Partner, and approached Melikhov about a business loan while continuing to make these promises. (SAC ¶¶ 26, 27, 30, 31, 32.) A plaintiff satisfies Rule 9(b) by providing a "general outline of the alleged fraud scheme . . . sufficient to reasonably notify the defendants of their purported role in the scheme." *Midwest Grinding Co., Inc. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir. 1992). In *Whitley v. Taylor Bean and Whitcker Mortgage Company*, the court found the plaintiffs sufficiently pleaded their fraud claims by outlining Defendants' general scheme of using an inflated home value and false employment educational and employment information on a loan application. 607 F. Supp. 2d 885, 892, 896–97 (N.D. Ill. 2009). Plaintiffs comparably outlined Defendants' general scheme from the beginning by explaining Drab's representations following

the trip to Africa, his continued interest in contributing to U4G Group, and promises that he would find sponsorship to advance the interests of U4G Group. (SAC ¶¶ 25, 29, 30.)

Plaintiffs also adequately alleged their reliance on Drab's misrepresentations by claiming they would have acted differently if they had known Defendants' true financial condition. *See Martinez v. Freedom Mortg. Team, Inc.*, 527 F. Supp. 2d 827, 837 (N.D. Ill. 2007) (denying the defendants' motion to dismiss the plaintiff's fraud claim where the defendants told the plaintiff he was qualified for the loan he received. The court noted the defendants' misrepresentations were material since the plaintiff would have acted differently if the truth was known and they concerned information upon which the plaintiff would be expected to rely). Nevertheless, Defendants attack Melikhov's purported reliance on Drab's promises regarding sponsorships of the Event as a factor in loaning Defendants' $5 million because those representations were made in June 2014 and early 2015—months after Melikhov provided the first disbursements of the loan. (Dkt. 61 at 7.) Even if the Court were to disregard these statements, as discussed above, the rest of the fraud allegations are sufficient to support Plaintiffs' fraud claims. In any event, Drab made numerous representations to Melikhov prior to the disbursement of the loan as to how he could attract sponsors to contribute to Melikhov's charities, including representations about his ability to attract Deutsche Bank and EON as sponsors. (Dkt. 65 at 8; SAC ¶¶ 27, 39.) A plaintiff who provides the dates as well as the speaker and substance of the statement meets the heightened pleading standard for fraud. *Zic v. Italian Gov't Travel Office*, 149 F. Supp. 2d 473, 477 (N.D. Ill. 2001). The court in *Zic* explained that the plaintiff adequately alleged a fraudulent scheme by providing facts that demonstrated the defendant attempted to avoid obligations to the plaintiff and made repeated unfulfilled promises. *Id.* Similarly, Plaintiffs allege that Drab continuously made false statements regarding the sponsors and provide the dates and substance

of these statements. (SAC ¶ 39, 52.)  Additionally, in *Towers Financial Corp. v. Solomon*, the court found that the plaintiffs' fraud claims satisfied the heightened pleading standard as the plaintiffs described the parties involved, the nature of the alleged misrepresentations, and the general time frame in which they were made. No. 89 C 913, 126 F.R.D. 531, 536 (N.D. Ill. July 10, 1989).  The plaintiffs entered into an agreement to purchase stock based on Defendants' representations that the companies were profitable and that the companies' reserves were adequate to meet all pending and potential claims. *Id.* at 534–35. The present matter is comparable as Plaintiffs allege that they agreed to loan Defendants $5 million based on Drab's representations about his wealth and ability to contribute to U4G Group. (*See, e.g.,* SAC ¶¶ 30, 31.)  Plaintiffs adequately allege the facts underlying Drab's misrepresentations as well as their role within a larger scheme of fraud.

Finally, Defendants argue that a complaint which attributes misrepresentations to all defendants "lumped together for pleading purposes" is generally insufficient. *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (citation omitted); (Dkt. 61 at 10–11).  Although the Court acknowledges that a complaint which attributes misrepresentations to all defendants "lumped together for pleading purposes" generally is insufficient, the present case presents an exception. *Sears*, 912 F.2d at 893; (Dkt. 61 at 10–11.)  When an agent authorized to make a contract on the principal's behalf uses fraud to bring about the contract, "the principal is liable even if the agent is acting solely to feather his own nest." *Ackerman*, 172 F.3d at 471.  Additionally, Drab admits that he is the owner, officer, director, and board member of Defendants Česká Energie, a.s. and Česká Plynárenská a.s., and Plaintiffs allege that Drab's representations led to a business loan to his companies, which they have alleged are Drab's alter ego. (Drab's Partial Answer to SAC ¶ 4;) *see also Duggan v. Terzakis*, 275 F. Supp. 2d 968, 973 (N.D. Ill. 2003) (finding that the plaintiffs

satisfied Rule 9(b) although multiple defendants were "lumped together" throughout the complaint given that the entities were alter egos of one another and plaintiffs alleged substantial overlapping ownership). Thus, Plaintiffs provided a general outline of the fraud scheme to notify Defendants of their role. *Whitley*, 607 F.Supp.2d at 892. Defendant's motion to dismiss Counts III and VII is denied.

## IV.    Unjust Enrichment Claim

Defendants seek dismissal of Plaintiffs' unjust enrichment claim (Count V) as duplicative of Plaintiffs' breach of contract claim (Count I). In Count I, Melikhov and Melmar allege that the Business Loan Agreement was valid and that Defendants breached the agreement by failing to repay the loan. (SAC ¶¶ 73–77.) In Count V, Plaintiffs allege that Defendants have been unjustly enriched by the $5 million loan and that they had no right to the money due to their wrongful conduct. (SAC ¶¶ 95–96.) In their unjust enrichment claim, however, Plaintiffs also reallege and incorporate all prior allegations, including the paragraphs validity of the Business Loan Agreement.

When the relationship of two parties is governed by contract, a claim for unjust enrichment may only be brought if the conduct at issue falls outside the contract. *Util. Audit Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688–89 (7th Cir. 2004). Two reasons support this rule. *Cohen v. Am. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013). First, the doctrine of unjust enrichment is a remedy for an implied contract, and if an express contract exists as to the parties' conduct, a contract cannot be implied. *Id.* Second, since unjust enrichment is an equitable remedy, it is only available when an adequate legal remedy is nonexistent. *Id.* "In determining whether a claim falls outside a contract, the subject matter of the contract governs, not whether the contract contains terms or provisions related to the claim." *Utility*, 383 F.3d at 689.

Despite this rule, Plaintiffs argue that at the complaint stage, they may plead unjust enrichment as an alternative to breach of contract. Plaintiffs ability to plead claims unjust enrichment in the alternative to their breach of contract claim, however, is foreclosed in this context. *See* Fed. R. Civ. P. 8(d)(2); *Cohen*, 735 F.3d at 615. While a plaintiff may plead separate counts of breach of contract and unjust enrichment, a plaintiff cannot include allegations of an express contract governing the relationship between the parties in its claim for unjust enrichment. *Cohen*, 735 F.3d at 615 (citing *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. App. Ct. 2005)). Here, Plaintiffs' unjust enrichment claim incorporates the allegations that an express contract existed between the parties, and Plaintiffs allege the existence of an express contract regarding the $5 million business loan throughout the SAC. (*See* SAC ¶ 33.) *See also Cole–Haddon, Ltd. v. Drew Philips Corp.*, 454 F. Supp. 2d 772, 777 (N.D. Ill. 2006) (explaining the plaintiff did not adequately plead an unjust enrichment claim in the alternative because the claim reasserted all allegations, including those alleging the existence of a contract); *Homestead Ins. v. Chicago Transit Auth.*, No. 96 C 4570, 1997 WL 43232, at *1, *4 (N.D. Ill. Jan 23, 1997) (dismissing the plaintiff's unjust enrichment claim as it "adopts by reference all the allegations in the contract claim (Count I), including paragraphs alleging an express contract between the parties."). Therefore, Count V is dismissed without prejudice.

## V.    Investment Adviser Claims

Plaintiffs allege that Defendants violated the Investment Advisers Act ("IAA") by failing to register as investment advisers (Count XIII), Defendants breached their fiduciary duties as investment advisers (Count XIV), Defendants committed fraud as investment advisers (Count XVI), and they are entitled to an equitable accounting resulting from the breach of fiduciary duty (Count XV). Defendants seek dismissal of these claims on the grounds that Plaintiffs have failed

to sufficiently allege that any Defendant is an investment adviser subject to the IAA.

For Plaintiffs' IAA claims to survive, Plaintiffs must first sufficiently allege that Defendants were "investment advisers" subject to the IAA. *Polera v. Altorfer, Podesta, Woolard & Co.,* 503 F. Supp. 116, 119 (N.D. Ill. 1980). An investment adviser is:

> [A]ny person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2(11) (2012).

This "definition, however, is far from absolute[,]" as the Act includes several exceptions and authorizes the SEC to exclude others by rule. *Lowe v. SEC*, 472 U.S. 181, 204 (1985). The key inquiry to determine the applicability of the IAA is to assess whether Defendants were engaged in the business of giving investment advice about securities to others. *Wang v. Gordon*, 715 F.2d 1187, 1192 (7th Cir. 1983). To determine whether an individual is "in the business of advising others" courts look to whether the individual "holds himself out" as an investment adviser, which can include: "(t)he maintenance of a listing as an investment adviser in a telephone or business directory; the expression of willingness to existing clients or others to accept new clients; or the use of a letterhead indicating any activity as an investment adviser." *Zinn v. Parrish*, 644 F.2d 360, 363 (7th Cir. 1981) (quotation marks omitted).

In support of their claims that Defendants acted as investment advisers, Plaintiffs allege that Defendants, for compensation, provided advice and analysis(es) regarding securities and acted as Plaintiffs' Investment Adviser(s) in connection with the transactions and activities complained of herein (SAC ¶ 156), and drafted the MOUs, which were investment advisory

agreements. (*Id.* ¶ 151.) Plaintiffs further assert that Defendants acted as investment advisers because the MOUs relate to advising persons and entities on how to invest their money in energy projects. (Dkt. 65 at 6.)

Plaintiffs' allegations that Defendants acted as investment advisers are conclusory and belied by their complaint. Outside of their conclusory allegation that Drab was an investment adviser, Plaintiffs appear to solely rely on the provisioning of the MOUs to support their IAA claims. The MOUs, however, do not indicate that Defendants provided Plaintiffs with any advice, let alone advice regarding the value or advisability of investing in securities. Furthermore, there are no allegations that Defendants were compensated for any advice provisioned to Plaintiffs. Even Plaintiffs' unsupported argument that the MOUs relay advice on how to invest money in "energy projects" is telling. To fall within the IAA's ambit, one has to be in the business of providing advice on investing in *securities*; purportedly advising on investing in "energy projects" is insufficient. *See Zinn*, 644 F.2d at 363 (finding that district court erred when it "failed to distinguish between ordinary business advice and advice on securities" when defendant's management contract stipulated that he would provide advice on "business investments").

The case at bar is also similar to the Seventh Circuit's decision in *Wang*, where the court affirmed the dismissal of Plaintiff's investment advisor claims. In *Wang*, the plaintiff alleged that the defendant mailed a letter outlining a sale agreement, which included the transfer of some securities, and that the defendant received compensation. 715 F.2d at 1192. The court found these allegations insufficient to support a claim under the IAA since the defendant did not regularly issue reports concerning securities, the defendant was compensated for the sale rather than for information regarding securities, and did not engage in the business of providing

investment advice in securities. *Id.* Similar to *Wang*, the MOUs sent by Drab to Melikhov outline the terms of the investment (or a loan) as well as repayment of the purported investment; they do not indicate that Drab provided any security investment advice to Melikhov. (Dkt. 55, Ex. A.) Also similar to *Wang*, Melikhov has not alleged that Drab regularly "engage[d] in the business of giving investment advice about securities" nor that Drab was compensated for information regarding securities. *Wang*, 715 F.2d at 1192 (citing *Zinn*, 644 F.2d at 364). *See also Polera*, 503 F. Supp. at 119 (dismissing plaintiff's IAA claim because the plaintiff failed to allege that the defendants received special compensation for services rendered "not solely incidental to their brokerage business").

The Court does not reach the question of whether Plaintiffs properly stated a claim against Defendants under the IAA because after reviewing the SAC, the Court concludes that Plaintiffs failed to sufficiently allege that Defendants were "investment advisers" under the IAA. *See Wang*, 715 F.2d at 1192. For the reasons mentioned above, the Court dismisses Counts XII–XVI without prejudice.

## VI. Plaintiffs' Request to Amend the Complaint

Plaintiffs seek to amend their complaint to add securities law claims related to Defendants' pledged shares in Česká Plynárenská as collateral for the $5 million loan. (Dkt. 65 at 14–15.) Specifically, Plaintiffs contend that under federal law, a pledge of securities as collateral for a loan constitutes a sale of securities under the 1934 Securities Exchange Act. (*Id.* at 14–15.) Defendants respond that Plaintiffs have already amended the complaint twice, and Plaintiffs have possessed the facts underlying these securities claims for over three years. (Dkt. 66 at 11–12.)

When a party requests to amend its pleading, Rule 15 requires courts to "freely give leave

when justice so requires." Fed. R. Civ. P. 15(a)(2). The leave sought should be 'freely given' in the absence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment[.]" *Forman v. Davis*, 371 U.S. 178, 182 (7th Cir. 1962). The Court does not find any evidence of "undue delay, bad faith or dilatory motive" by Plaintiffs. *Id.* Defendants rely on *Doe v. Howe Military Sch.*, to support their contention that Plaintiffs should not be given leave to file the complaint. 227 F.3d 981, 989 (7th Cir. 2000). In *Howe*, the court noted that the defendants failed to provide a reason why this claim could be brought at the last minute, and allowing plaintiffs to amend would have been futile since the action in the proposed amendment would have been barred under the state's statute of limitations. *Id.* at 990. Since the proposed amendments are not being made at the last minute like in *Howe*, as discovery is ongoing, and there is no evidence that their claims would be futile, the Court grants Plaintiffs' request to amend the complaint to add securities law claims.

## CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss Counts III and VII is denied. Defendants' Motion to Dismiss Counts V, VI, XII, XIII, XIV, XV, and XVI is granted without prejudice. Further, this Court declines to compel mediation and/or arbitration of Counts II, III, or IV. The Court grants Plaintiffs' request to amend the complaint to add securities law claims.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: July 31, 2017